**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| PREMERA BLUE CROSS,<br><br>                    Plaintiff,<br><br>   vs.<br><br>TRANSFORM WEIGHT LOSS, LLC,<br>PETER BILLING, M.D., and<br>NORTHWEST REVENUE CYCLE<br>MANAGEMENT,<br><br>                  Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.    This case concerns Defendants' systematic abuse of the federal No Surprises Act's independent dispute resolution process to secure payments from private insurers, including Plaintiff Premera Blue Cross ("Premera"), for services entirely outside the scope of the NSA's protections and that are grossly out of line with the prevailing reimbursement rates for the services provided.

2.    Defendants Transform Weight Loss and Dr. Billing (collectively, "Transform") provide weight loss services in the state of Washington. Transform does not have a contractual

COMPLAINT
JURY TRIAL DEMANDED - 1

relationship with Premera. Accordingly, when Transform chooses to treat a patient who has Premera insurance (a Premera "member"), it does so on an "out-of-network" basis.

3. As is true for any other out-of-network service, Premera's reimbursement for the services Transform provides is determined by the out-of-network benefits included in the member's policy with Premera. Those benefits belong to the *member*.[1] Premera and Transform do not form any contractual relationship with one another with respect to these or any other services.

4. Premera has paid Transform (via its members) every dollar it is owed for services it provided to Premera's members according to the out-of-network benefits available under the members' policies. If Transform believes it is entitled to greater reimbursement, it can—indeed, legally must—attempt to collect that additional payment from the patient.

5. But beginning in or about 2024, Transform concocted an alternative path to payment—one designed to coerce Premera into paying significant sums that Transform knew Premera did not owe.

6. Specifically, Transform has initiated (and has confirmed it will continue to initiate) proceedings through an independent dispute resolution ("IDR") process created by the federal No Surprises Act ("NSA"), 42 U.S.C. § 300gg-111, to secure leverage over Premera— all while knowing that those proceedings have been and will continue to be premised on false representations.

7. Transform knows that medical services it provides to Premera's members at one of Transform's ambulatory surgery centers ("ASCs") are not eligible for resolution under the NSA because there is no "surprise" bill to a patient who knowingly seeks care from an out-of-network provider at an out-of-network facility.

---

[1] At times, Premera will pay the out-of-network benefits a member is due directly to the provider as a way to reduce administrative burdens for the member. However, that Premera might make a payment directly to an out-of-network provider does not change the fact that Premera owes the monies *to the member*, who in turn is obligated to pay the provider.

COMPLAINT
JURY TRIAL DEMANDED - 2

8.      Nonetheless, Transform falsely attests to the Centers for Medicare and Medicaid ("CMS") that the out-of-network care it provides at its ASCs is eligible for resolution under the NSA's IDR procedures.

9.      Transform knows that if it were to truthfully acknowledge that the services are not eligible, Transform could not access the NSA's IDR procedures. Instead, it would be left to seek additional payment from its patients—just like every other out-of-network provider who rendered the same care.

10.      But Transform was and is unwilling to let rules and truth get in the way of a profitable scam. So, time and again, Transform—through its agent, Defendant Northwest Revenue Cycle Management ("NWRCM")—has lied to CMS about the eligibility of the services for which it seeks to use the NSA's IDR process. The only reason for these lies is to obtain windfall payments from Premera that Transform knows it could not obtain any other way.

11.      Transform also knows that each time it initiates the IDR process for services provided to a Premera member, it imposes substantial financial and other burdens on Premera. Premera *must* participate in the IDR process in order to avoid default awards being entered against it—a process that includes considerable administrative and operational burdens related to researching and responding to each dispute and payments of mandatory administrative fees.

12.      Premera has repeatedly advised Transform and NWRCM that their conduct is improper and demanded that they cease and desist from imposing these burdensome obligations on Premera. Transform and NWRCM each responded by confirming that they will carry on with business as usual—more lies, more fees, more burdens, and, in Transform's mind, more leverage over Premera: either pay more than what is owed, or continue to face the burdens of the scheme.

13.      Premera brings this action to hold Defendants accountable for their repeated, intentional, and dangerous conduct which constitutes abuse of process and violates the Washington Consumer Protection Act ("CPA"), RCW 19.86. Absent this Court enjoining this abuse of the NSA, Premera will be forced to continue to either participate in the IDR process—

COMPLAINT
JURY TRIAL DEMANDED - 3

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

at great expense—or risk default awards in amounts that put its customers and itself at financial risk.

14. The CPA was enacted to prohibit exactly this kind of unfair and deceptive business practice, which injures not just Premera and the groups for whom it administers healthcare plans, but also harms Washington patients and providers who play by the rules. Defendants' conduct serves no purpose other than to unfairly enrich themselves while raising the cost of healthcare in Washington.

**PARTIES**

15. Plaintiff Premera Blue Cross is a nonprofit healthcare company based in Mountlake Terrace, Washington, that offers health insurance plans to individuals and employer groups throughout Washington and Alaska.

16. Defendant Peter Billing, M.D., is an individual who, upon information and belief, is a resident of Washington State and practices medicine in Washington.

17. Defendant Transform Weight Loss, LLC, is owned by Dr. Billing and operates weight loss clinics in Washington State. Upon information and belief, Transform is a Washington limited liability company with its principal place of business in Washington.

18. At all relevant times, Transform and Dr. Billing have been out-of-network providers that do not have participating provider or facility agreements with Premera.

19. Defendant Northwest Revenue Cycle Management is the agent of Defendants Transform and Dr. Billing. It provides billing and revenue cycle management services to healthcare providers, including Transform and Dr. Billing. Upon information and belief, NWRCM is based in Florida and India, and conducts business in Washington State.

**JURISDICTION AND VENUE**

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically, the No Surprises Act, 42 U.S.C. § 300gg-111, and the regulations promulgated thereunder.

COMPLAINT
JURY TRIAL DEMANDED - 4

21.     While Premera's causes of action were created by state law, their resolution is inextricably intertwined with interpretation and application of federal law. Specifically, this action presents substantial federal questions about the interpretation and enforcement of the No Surprises Act. The Court *must* interpret the NSA to properly adjudicate Premera's claims, and as a result, this action raises a substantial federal question.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. The services at issue were provided in Washington State, the IDR proceedings were initiated from Washington State, Defendants reside or are located in Washington State, and Defendants have filed or threatened to file actions to enforce IDR determinations in Washington State courts within this district.

## BACKGROUND

**Typical Out-of-Network Payment Framework**

23.     Health insurers like Premera contract with a network of healthcare providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Such contracts govern the rate for the medical services that are provided and prohibit providers from billing patients above that amount. Generally, patients receive better and more affordable health care coverage when receiving treatment from in-network providers.

24.     Patients can also choose to obtain treatment from "out-of-network" providers which have no contract with their health insurer. Because out-of-network providers are not bound by contractual billing limitations, patients typically pay more when they elect to receive care from out-of-network providers. The health insurer will cover a portion of the cost of the services, and the out-of-network provider will "balance bill" the patient for the difference between their inflated, non-market-based rates—known as billed charges—and the amounts paid by health insurers. Patients who choose to seek treatment from an out-of-network provider understand that it will likely be more expensive than in-network care because they will likely receive less coverage from their health insurer and, in turn, higher bills from their out-of-network provider.

COMPLAINT
JURY TRIAL DEMANDED - 5

25. Out-of-network providers understand that if their charges exceed the out-of-network benefit provided by a patient's insurance plan, they will need to collect payment from the patient directly. This is because, by definition, there is no contract between the insurer and an out-of-network provider—or any other independent obligation—that requires the insurer to pay *any* amount on the claim.

**The No Surprises Act**

26. The No Surprises Act was enacted as part of the Consolidated Appropriations Act of 2021 and became effective on January 1, 2022. In passing the NSA, Congress sought to limit the astronomical bills patients face when circumstances outside their control—like emergencies—require them to receive expensive out-of-network care that is not fully covered by insurance.

27. The NSA protects patients from "surprise" billing for three strictly defined categories of out-of-network care: (1) emergency services; (2) non-emergency services furnished at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135.

28. The statute addresses non-emergency care provided by an out-of-network provider at an in-network facility because in that scenario, a patient might still be legitimately surprised by a medical bill. For example, an out-of-network anesthesiologist might assist with a patient's surgery at an in-network hospital. Because the patient could not choose her anesthesiologist ahead of time, she would be "surprised" by being charged an out-of-network rate for the anesthesiologist's services, even though the surgery was at an in-network hospital. The NSA was enacted to prevent such surprises. In contrast, the NSA does not apply when a patient seeks care from an out-of-network physician at an out-of-network facility, because there is no surprise to the patient in that scenario—the patient *knows* they are seeking out-of-network care.

COMPLAINT
JURY TRIAL DEMANDED - 6

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

29.     Prior to the enactment of the NSA, patients with commercial insurance could face large bills for these types of surprise out-of-network bills because out-of-network providers are not restrained by contracts with insurers that limit the amount they can charge to patients for this care.

30.     Congress passed the NSA to reduce the risk that patients will face such surprise out-of-network medical bills. For the three types of services it covers, the statute mandates that patients are not required to pay out-of-network providers any more than what they would have had to pay if the providers were in-network with their insurance (in the form of deductibles, coinsurance, or copays).

31.     In order to take patients out of the middle of surprise billing disputes, and because providers are prohibited from collecting their full billed charges from patients for services that are covered under the NSA, the statute also created a framework for health insurers and out-of-network providers to resolve payment disputes related to eligible services. *See* 42 U.S.C. § 300gg-111(c). The framework includes three steps: (1) open negotiations, during which the insurer and provider try to resolve the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a payment determination from a certified independent dispute resolution entity ("IDRE").

32.     When a party initiates an open negotiation pursuant to this framework, it must provide formal written notice to the non-initiating party within 30 business days of the initial payment or notice of claim denial for the service. Then the initiating party must attempt in good faith to negotiate a resolution over a 30-business-day negotiation period. *See* 42 U.S.C. § 300gg-111(c)(1)(A).

33.     If no agreement is reached during the 30-business-day open negotiation period, the initiating party may begin the IDR process with CMS.

34.     The IDR process is *not* available for *all* insurer-provider payment disputes. Instead, to be eligible for IDR, the following conditions must be met:

COMPLAINT
JURY TRIAL DEMANDED - 7

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

a.  The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services provided at in-network facilities, or air ambulance services;

b.  The services involve a patient with health care coverage through a group plan or health insurer subject to the NSA (*e.g.*, not coverage through government programs like Medicare or Medicaid);

c.  A state surprise billing law does not apply to the dispute;

d.  The underlying services were covered by the patient's health benefit plan;

e.  The patient did not waive the NSA's balance billing protections;

f.  The provider initiated and exhausted open negotiations;

g.  The provider initiated the IDR process within four business days after the open negotiations period was exhausted; and

h.  The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

*See* 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

35.  Therefore, when initiating IDR, the initiating party must attest that those conditions have been met—*i.e.*, that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process."[2] *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).

36.  The initiating party must also provide notice to the non-initiating party that it has begun the IDR process.

37.  The parties then have just a few days to select an IDRE from a list maintained by CMS who will preside over the dispute. The initiating party selects the IDRE, and the non-initiating party may object to the selection within three business days. If the parties do not agree

---

[2] *See also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

COMPLAINT
JURY TRIAL DEMANDED - 8

on an IDRE, CMS assigns one to the dispute. The non-initiating party must also submit any objections to the applicability of IDR within this three-business-day period.

38.     Once an IDRE has been selected, federal regulations require the IDRE to "review the information submitted in the notice of IDR initiation to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v).

39.     However, IDREs have a substantial financial incentive to ignore eligibility objections to the process. IDREs are only entitled to compensation where they issue an award. Thus, it is perhaps unsurprising that IDREs have a disappointing track record of ignoring objections to the eligibility of services lodged by insurers and proceeding to issue payment awards that they are not permitted to issue.

40.     Unless the IDRE determines that IDR is inapplicable to the dispute, each party submits an offer for the payment it believes should be paid for the service at issue. The parties are also able to submit evidence supporting their offers. These submissions should reflect the amount that the insurer typically pays or the provider typically receives for the services.

41.     The offer and evidentiary submissions are confidential and are not shared with the other party.

42.     After receiving both parties' offers, the IDRE is required to select one of the two offers as the payment amount for the service at issue.

43.     If a party fails to submit an offer, the IDRE enters a default award in favor of the party who did submit an offer. This is true regardless of whether the prevailing party's offer bears any relation whatsoever to market rates, and regardless of whether the services are even eligible for IDR in the first place.

44.     The NSA presumes honest dealings on the part of the initiating party. Where, as here, the initiating provider falsely attests to the eligibility of the services at issue, the insurer must participate in the IDR process, or else it will receive a default judgment from the IDRE. This participation involves the insurer paying a non-refundable $115 administrative fee,

COMPLAINT
JURY TRIAL DEMANDED - 9

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

investigating the dispute to determine if it is eligible, submitting an objection to IDR applicability to the IDRE within the initial three-business-day period when necessary, and if this objection is denied, paying the IDRE's fee and submitting its confidential payment offer to the IDRE. If the insurer refuses to participate in a fraudulently initiated IDR process, it is subject to a default decision by the IDRE—meaning an award in the amount of the bad-acting provider's factitiously derived offer.

45. Where providers like Transform succeed in fraudulently procuring an award for services that are not eligible under the NSA, the insurer who has been victimized by this conduct has limited ability to overturn the decision.

46. No doubt recognizing the many fruits that can be realized by dishonest manipulation of the IDR process, Defendants have turned such abuse into a business model.

**FACTUAL ALLEGATIONS**
**Defendants' Improper Use of IDR**

47. Defendants Transform and Dr. Billing are out-of-network providers with respect to Premera, meaning they do not have a contract requiring Premera to pay specific rates for their services. Dr. Billing routinely performs services at Transform's out-of-network ambulatory surgical center.

48. On numerous occasions, Dr. Billing and Transform have provided non-emergency weight loss and related medical services to Premera members at Transform's out-of-network facility.

49. Before Premera's members receive any services from Transform, both the members *and* Transform are informed that the services are out-of-network and, therefore, the members' out-of-network benefits will apply.

50. Premera's members have the option to seek in-network care from providers who are contracted with Premera. Typically, in-network services result in much lower out-of-pocket costs (in the form of deductibles, copays, and coinsurance) for members. Therefore, members who choose to seek care from an out-of-network provider like Transform do so knowing that

COMPLAINT
JURY TRIAL DEMANDED - 10

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

they will be responsible for paying the provider the difference between what their out-of-network benefit pays and what the provider charges.

51.    While Transform may charge whatever it wants for the care it provides, Premera's financial obligation to pay for that care is limited to the out-of-network coverage its members purchased. In other words, Transform's right to payment for the services it provides to Premera's members is limited to the patients themselves, through a combination of the member's out-of-network benefits and any additional amounts the patient pays out of pocket.

52.    The No Surprises Act does *not* change Premera's obligations to Transform. When Dr. Billing performs non-emergency services for Premera's members at Transform's facility, or at any other out-of-network facility, those services do not fall within any of the three categories of services subject to the NSA.

53.    Nevertheless, Transform, through its agent NWRCM, repeatedly initiates the NSA's IDR process against Premera for ineligible services, despite knowing that the NSA does not permit them to do so. Defendants do this because they believe they can extract much greater payment from Premera by inappropriately exploiting the IDR process than they would otherwise be able to collect from the patients they treat.

54.    Each time Defendants initiate such IDR proceedings, they falsely attest that the services are eligible for IDR and within the scope of the NSA. Defendants' actions are clearly intended to harness the power of the federal government to hold Premera liable for payments it does not owe and to induce Premera to settle claims for which it holds no responsibility.

55.    In every instance in which Defendants have foisted this scheme on Premera, Premera has objected to the proceedings as being improper under the NSA because the services are not covered by the statute. Premera has repeatedly and consistently notified Defendants of this fact before the IDRE gets involved; during the IDRE selection phase; and when it submits its offer to the IDRE.

COMPLAINT
JURY TRIAL DEMANDED - 11

56. Defendants cannot plausibly contend that they need Premera to tell them what is obvious from the face of the NSA, but, regardless, even with the benefit of Premera's objections, they continue to force the IDR process upon Premera. Defendants never inform the IDRE that the entity has no authority to issue an award for the services at issue.

57. If Defendants acted truthfully, Transform would be stuck with the market-based rates that insurers and patients pay for these out-of-network services. But, not letting a good lie go under-monetized, once they have harnessed the power of the IDR process, Defendants submit exorbitant offers for the services at issue, which can be more than *one thousand percent* more than the rates Premera pays its in-network providers for the same service.

58. In many cases, IDREs issue payment determinations against Premera and in favor of Defendants based on Defendants' false certifications and grossly exaggerated offers. In each case, the IDRE does not explain why it issued a payment determination for services that were not eligible for IDR under the NSA.

59. Defendants are taking advantage of a system that is susceptible to such fraud. This is due in part to the huge volume of claims submitted to IDR and the quick response times with which insurers are required to comply under the statute. But it is also a product of IDREs' misaligned incentives: IDREs are only paid if they issue a final award in a given dispute. As a result, their own financial interests dissuade IDREs from dismissing ineligible disputes.

60. When confronted directly with the illegality of their scheme to use IDR to extort payment from Premera for services not covered by the NSA, Defendants offer a post-hoc description of the IDR proceedings as "voluntary" arbitrations between Transform and Premera. Defendants argue that, even though the services were not eligible for IDR, by participating in the IDR process, Premera somehow formed an independent, voluntary agreement with Transform to arbitrate payment disputes.

61. But Defendants know there was nothing *voluntary* about the process they foisted on Premera: the NSA does not offer insurers an off-ramp, even when it is indisputable that the

COMPLAINT
JURY TRIAL DEMANDED - 12

NSA does not apply to the services at issue. Premera consistently objects throughout the IDR process on the grounds that it does not apply, to no avail. Defendants use this structural problem to their advantage: they know that once they've initiated IDR proceedings, if the IDRE fails to properly dismiss the dispute, Premera has no choice but to participate or a default judgment will issue in Transform's favor at its absurdly high proposed reimbursement rate.

62.     Defendants also know that they have no contractual right to arbitrate or seek payment directly from Premera and that the obligations for payment fall uniquely to their patients.

63.     Defendants actions show they want to have their cake and eat it, too: First, they lie to CMS to force Premera to participate in an involuntary federal process. Then, when called out for their lies, Defendants switch tacks and say that the IDR process was a "voluntary" arbitration all along.

64.     Of course, Defendants' attempt to side-step their blatant abuse of the NSA by suggesting that Premera voluntarily agreed to arbitrate payment disputes using the IDR process completely ignores that, absent the NSA's applicability, Premera is not obligated to pay *anything* for the out-of-network services Transform provides—and thus, there is no dispute between the parties to arbitrate.

65.     But Defendants are persistent. They have made it clear to Premera that they intend to continue abusing the IDR process for ineligible disputes. Specifically, in January and February 2026, Defendants wrote to Premera and declared that they will continue to seek to "arbitrate" payment disputes for non-emergency services provided at out-of-network facilities using the NSA's IDR process—even after Premera stated, in writing, that it will not arbitrate any disputes with Defendants, through the IDR process or otherwise.

66.     Defendants' attempts to secure IDR determinations on ineligible services by using false certifications, and then characterization of those determinations as enforceable "arbitration awards," violates the NSA and constitutes an abuse of the legal process and a deceptive practice.

COMPLAINT
JURY TRIAL DEMANDED - 13

67. Indeed, Defendants have made it clear to Premera that their tactics are motivated, at least in part, by a desire to force Premera to settle claims for which it is not liable and to agree to a facility participation agreement with Transform at exorbitant rates to which no rational market participant would otherwise agree.

**Impact on Premera and the Public**

68. Defendants' conduct has caused and continues to cause harm to Premera by forcing it to expend time and resources defending itself in IDR proceedings for ineligible services, and by potentially forcing Premera to pay amounts that are not owed when Defendants characterize their falsely obtained IDR determinations as enforceable "arbitration awards."

69. Indeed, Defendants' scheme is designed so that Premera has no way to defend itself: If Premera refuses to participate in IDR proceedings on the basis that a service is ineligible for the process, it risks having an exorbitant default award entered against it. But if Premera participates in IDR proceedings and the IDRE issues an improper award over Premera's objections, Premera must defend against Defendants' assertion that it is subject to enforceable "arbitration awards" against it.

70. Premera is not the only one footing this bill. Premera contracts with groups to provide administrative services—arrangements that are referred to in the industry as "administrative services only" (or "ASO") arrangements or "self-funded" plans. ASO plans, which include Washington businesses of all sizes, are the ones who bear the costs of these improperly-obtained, grossly-inflated bills for services their members receive.

71. Defendants' systematic abuse of the IDR process undermines the integrity of the federal NSA and its carefully limited dispute resolution mechanism. It imposes meaningful financial impact on the insurers in this state and those who offer insurance benefits to their employees or union members. And it puts providers who do the right thing—either by contracting with insurers and honoring the reimbursement rates they agreed to or by charging fair, market rates for out-of-network services—at a substantial competitive disadvantage.

COMPLAINT
JURY TRIAL DEMANDED - 14

72. If left unchecked, Defendants' conduct will continue to deplete funds set aside for covering healthcare for citizens of Washington, incentivize copy-cat behavior by other out-of-network providers, and make it more difficult for insurers to build networks with providers that help control the cost and quality of healthcare offered in the state.

73. The public interest is served by ensuring that the federal IDR process is used only for its intended purpose—resolving disputes over the limited categories of services specified in the No Surprises Act.

### FIRST CAUSE OF ACTION
### Violation of the Washington Consumer Protection Act, RCW 19.86

74. Premera repeats and realleges each and every allegation set forth in paragraphs 1 through 73 above as if fully set forth herein.

75. Defendants' repeated initiation of IDR proceedings for services that are not subject to the NSA, and their characterization of the awards procured through those proceedings as enforceable "arbitration awards," is an unfair and deceptive practice in trade or commerce in violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86. Defendants have engaged in, and continue to engage in: (1) unfair or deceptive acts or practices, (2) occurring in trade or commerce, (3) that affect the public interest, and (4) that cause injury to Premera's business or property.

76. Specifically, Defendants have engaged, and continue to engage, in deceptive acts and practices by falsely attesting that their services provided at out-of-network facilities are "qualified IDR items or services" that are subject to the NSA and eligible for the federal IDR process.

77. Defendants know, or should know, that these attestations are false and that the services at issue are categorically ineligible for IDR under the No Surprises Act.

78. Defendants' false certifications have the capacity to deceive IDREs into accepting and deciding disputes that were outside their jurisdiction under the federal regulations.

COMPLAINT
JURY TRIAL DEMANDED - 15

79.    Defendants' subsequent characterizations of the IDR determinations obtained through false certifications as enforceable "arbitration awards" constitute additional deceptive acts, as those characterizations misrepresent whether the parties ever agreed to arbitrate any dispute, and they also misrepresent the legal validity and enforceability of the IDR determinations.

80.    Defendants' conduct is unfair, immoral, unethical, oppressive, and unscrupulous because Defendants have knowingly misused a federal statute designed to protect consumers, exploiting it for financial gain in circumstances where it undeniably does not apply.

81.    Defendants' conduct is also unfair because it is anti-competitive. By charging Premera exorbitant prices for their services—which are grossly out-of-line with market rates—and abusing the IDR process in attempts to force Premera to pay those charges, Defendants have an unfair advantage over their competitors who charge and collect fair market rates.

82.    In addition, Defendants' conduct is unfair because the injury it causes to Premera, its group customers, its members, and to the integrity of the IDR process substantially outweighs any benefit that might be derived from it. Defendants' conduct causes substantial injury that consumers, Premera's group customers, and Premera cannot reasonably avoid and that is not outweighed by any countervailing benefits.

83.    Defendants' conduct occurred in trade or commerce within the meaning of the CPA.

84.    Defendants' conduct affects the public interest because it involves a systematic pattern of misusing a federal statutory process, not isolated transactions.

85.    Defendants' conduct also affects the public interest because it impacts the healthcare and insurance industries, which are matters of substantial public concern in Washington. Defendants' actions threaten to undermine the effectiveness of federal consumer protection legislation and encourage similar abuses by other providers.

COMPLAINT
JURY TRIAL DEMANDED - 16

86.    If left unchecked, Defendants' conduct will result in widespread harm to health insurers, their group customers, their members, as well as Defendants' competitors throughout Washington State, as increased improper payments drive up insurance costs and destabilize the competitive market for services.

87.    As a direct and proximate result of Defendants' violations of the CPA, Premera has suffered injury to its business and property. In particular, Premera has been forced to expend resources defending against improper IDR proceedings and enforcement actions. Defendants' actions are ongoing, as is the harm to Premera.

88.    Premera faces potential liability for payment of amounts that are not owed under applicable law.

89.    As a result of Defendant's violations of the CPA, Premera is entitled to recover its actual damages, treble damages as provided by RCW 19.86.090, costs, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Declaratory Judgment, 28 U.S.C. § 2201

90.    Premera repeats and realleges each and every allegation set forth in paragraphs 1 through 73 above as if fully set forth herein.

91.    An actual, justiciable controversy exists between Premera and Defendants regarding whether an out-of-network provider may use the IDR process established by the No Surprises Act, 42 U.S.C. § 300gg-111, to litigate a payment dispute with an insurer for services provided at an out-of-network facility.

92.    Defendants have initiated IDR proceedings and certified that services provided by Transform and Dr. Billing are "qualified" and within the scope of the federal IDR process.

93.    Premera contends that such services are categorically ineligible for the federal IDR process because they do not fall within any of the three categories of services specified in the No Surprises Act and its implementing regulations.

COMPLAINT
JURY TRIAL DEMANDED - 17

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

94.     The dispute between the parties is ripe for adjudication. Defendants have already obtained IDR determinations and are attempting to improperly enforce them as enforceable "arbitration awards," creating an immediate controversy with real-world consequences. Further, Defendants have affirmatively declared their intent to continue their behavior.

95.     A declaration by this Court is necessary and appropriate to resolve the parties' dispute and provide certainty regarding the application of federal law.

96.     Premera is entitled to a declaratory judgment that:

a.   Any IDR determinations obtained by Defendants for services provided by Transform and Dr. Billing at Transform's out-of-network facility are invalid and unenforceable; and

b.   An insurer's response to an IDR proceeding initiated for services that not eligible under the NSA does not constitute an agreement to arbitrate, and any award or determination subsequently made in such a proceeding is not an enforceable arbitration award.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Premera Blue Cross respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

1.  **Declaratory Relief**: Enter a declaratory judgment that:

a.   Any IDR determinations obtained by Defendants for services provided by Transform and Dr. Billing at Transform's out-of-network facility are invalid and unenforceable; and

b.   An insurer's response to an IDR proceeding initiated for services that not eligible under the NSA does not constitute an agreement to arbitrate, and any award or determination subsequently made in such a proceeding is not an enforceable arbitration award.

2.  **Injunctive Relief**: Enjoin Defendants from:

COMPLAINT
JURY TRIAL DEMANDED - 18

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

a.  Initiating future IDR proceedings for services provided by out-of-network providers at out-of-network facilities;

b.  Falsely certifying that such services are "qualified IDR items or services" eligible for the federal IDR process; and

c.  Attempting to enforce IDR determinations obtained for such ineligible services.

3.  **Damages for CPA Violation**: Award Premera its actual damages resulting from Defendants' violations of the Washington Consumer Protection Act, trebled as provided by RCW 19.86.090;

4.  **Attorneys' Fees and Costs**: Award Premera its reasonable attorneys' fees and costs incurred in this action, as provided by RCW 19.86.090 and other applicable law;

5.  **Pre-Judgment and Post-Judgment Interest**: Award Premera pre-judgment and post-judgment interest as provided by law; and

6.  **Further Relief**: Grant such other and further relief as the Court deems just and proper.

DATED this 6th day of April, 2026.

KILPATRICK TOWNSEND & STOCKTON LLP

By  /s/ Gwendolyn C. Payton
Gwendolyn C. Payton, WSBA No. 26752
1420 5th Ave., Suite 3700
Seattle, WA 98101
gpayton@ktslaw.com
Telephone: (206) 626-7713
Facsimile: (206) 260-8946

*Counsel for Plaintiff Premera Blue Cross*

COMPLAINT
JURY TRIAL DEMANDED - 19

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946